**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| **Kimley Billie** ) | **C.A. No.** 3:26-cv-00796-JFA-SVH |
| ) | |
| *Plaintiff,* ) | |
| ) | **COMPLAINT** |
| **v.** ) | |
| ) | |
| **Sumter County Government** ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

<u>**VERIFIED COMPLAINT (JURY TRIAL DEMANDED)**</u>

Plaintiff Kimley Billie ("Plaintiff"), by and through undersigned counsel, brings this action against Defendant Sumter County, South Carolina, a political subdivision of the State of South Carolina ("Defendant" or "Sumter County"), and alleges as follows:

## I.     INTRODUCTION

1. This is a retaliation, interference and employment discrimination action arising from Defendant's decision to terminate Plaintiff almost immediately upon her return from medical leave protected by the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601–2654 ("FMLA"). It is also based on Defendant's failure to restore Plaintiff to an equivalent position following FMLA leave, including taking away key job duties, by forcing Plaintiff to sit at an unreasonably low and uncomfortable chair/desk arrangement as a penalty, and other interferences and retaliations regarding Plaintiff's FMLA and ADA rights. In addition to the FMLA violations, Defendant's actions also violated the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (1990) ("ADA"). Plaintiff suffered severe damages – amongst other damages this is a "destroyed pension" case.

2.     Defendant tacitly admitted the illegality of its conduct, stating in the termination documents "***frequent absences are unmanageable***." See attached **Exhibit A, p. 1**.  The only significant absence, and indeed Plaintiff's most obvious "frequent absences" -- were her FMLA/ADA protected medical leave only very recently concluded.

3.     Defendants stripped Plaintiff's medical leave of its statutory protection, treated it as unauthorized leave subject to termination, then punished Plaintiff for taking leave. Sumter County interfered with Plaintiff's FMLA rights by treating her FMLA-protected leave as a negative factor in an attendance-based termination decision. Defendant also denied Plaintiff the benefit of restoration to equivalent position, as well as the same duties, perquisites, benefits and seating arrangements she held before FMLA leave, despite knowing her medical condition and disabilities.  Defendants actions are a clear and obvious breach of the FMLA.

4.     Although it appears Defendant initially approved Plaintiff's FMLA leave, or failed to timely disapprove it, Defendant later interfered with Plaintiff's FMLA rights by treating that protected leave as an attendance violation and terminating her for "***frequent absences***," thereby denying her the benefit and protection of FMLA leave.

5.     Plaintiff is a long-term public employee who devoted twenty-six (26) years to county government in South Carolina—six (6) years with Clarendon County and twenty (20) years with Sumter County.

6.     Over the course of her twenty-six (26) year career in county government, Plaintiff accrued substantial pension/retirement benefits and was just ***22 months*** away from full pension eligibility/vesting with immediate retirement rights at the time of her illegal

termination. Unfortunately, Plaintiff had to liquidate her pension/retirement for living expenses.

**II.     PARTIES**

7.     Plaintiff Kimley Billie is a citizen and resident of South Carolina. She lives at 1918 Bethune Road, Pinewood, SC 29125.

8.     Defendant Sumter County, South Carolina is a political subdivision of the State of South Carolina and a state actor acting under color of law.

**III.     JURISDICTION AND VENUE**

9.     This Court has jurisdiction under 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

**IV.     ADMINISTRATIVE EXHAUSTION**

11.     On March 25, 2025, Plaintiff filed a Charge of Discrimination with SCHAC and the EEOC. See attached **Exhibit B**.

12.     On January 16, 2026, the United States Department of Justice issued Plaintiff a Notice of Right to Sue under Title VII of the Civil Rights Act of 1964 and Title I of the Americans with Disabilities Act. See email attached as **Exhibit C**.

13.     Plaintiff has satisfied all administrative prerequisites to filing suit for her ADA claims, including exhaustion of administrative remedies and receipt of a Notice of Right to Sue.

14.     Plaintiff's claims under the FMLA do not require administrative exhaustion and are properly before this Court.

## V.    FACTUAL ALLEGATIONS

15.    Plaintiff began her public service career with Clarendon County on October 23, 1998.  She was employed by Clarendon County in the Auditor's Office for almost seven years.  She had positive reviews.

16.    Based on **Exhibit D**, Plaintiff would have been eligible for retirement after twenty-eight years of service, on **October 24, 2026**. Instead, because of Defendant's illegal actions, she had to liquidate her pension for living expenses.

17.    On August 1, 2005, Plaintiff was hired by Sumter County as a front-office employee in the Auditor's Office, ultimately becoming Deputy Auditor.  She worked there for almost twenty (20) years, consistently performing her job duties in a satisfactory or better manner.  She held this job until December 12, 2024, when she was unlawfully terminated.

18.    Plaintiff's duties included greeting and assisting the public, responding to taxpayer inquiries, receiving and routing documents, entering and maintaining data in county systems, including First Time Issue of Newly Purchased Vehicle Reports ("FTI Reports"), processing routine requests, handling confidential information, and performing clerical and administrative tasks.

19.    Plaintiff was qualified for and capable of performing the essential functions of her position.  Plaintiff was competent and professional in the execution of her duties. Plaintiff had an excellent attendance record in Clarendon County and Sumter County.

20.    Initially, Plaintiff salary was approximately $18,000. After 26 years her salary had only risen to $35,767.  Although Plaintiff got regular cost of living adjustments, she did not fairly and regularly receive pay raises.

21.     Plaintiff was paid on an hourly basis, approximately $16.98 (net pay) per hour by the end of her position. See **Exhibit E** Excerpt of Record of Payments.   Plaintiff was paid every other week, and typically received a paycheck several days after the end of a two week pay period. Plaintiff typically received paychecks every other Friday, usually a week after the pay period just ended.  For example, Plaintiff's June 14, 2024 paycheck was payment for the week of May 27 through May 31, and June 3 through June 7.

22.     In January 2005, Lauretha McCants ("McCants" or "Supervisor") became Auditor of Sumter County following election.   McCants was Plaintiff's principal supervisor all of the 20 years she worked for Sumter County.

23.     In addition to Supervisor McCants, there were six employees in the office, one of whom was Plaintiff.

*Background: Supervisor McCants' Illegal Office Activity Demonstrates Motive, Hostility, and Pretext – and Leads Directly to Plaintiff's FMLA Leave and ADA Disability*

24.     Throughout her tenure, including prior to Plaintiff seeking and taking the medical leave in question, McCants illegally forced Plaintiff and others in the office to do "favors" for McCants, her friends and family, such as unlawfully reduce their tax bills.

25.     Plaintiff frequently sat near or within an earshot of other employees.  In 2019, Supervisor McCants purchased a used 2014 Mercedes.   Supervisor McCants expected office employees to submit to her requests to artificially lower tax bills for herself, friends and family.  Plaintiff heard McCants say to another employee:

*"I need you to adjust this for me"*

On information and belief: i) the other employee did just that, abated the tax bill, leading to a significantly reduced tax payment; ii)  McCants forced office staff to frequently lower assessment values for herself, her friends and family, leading to lower tax bills for the

preferred group, and iii) documents currently in Defendant's files, and requested contemporaneously herewith by discovery requests, will confirm Defendant "abated" the original tax bill showing a much higher assessment.

26.     Attached as **Exhibit F** is an excerpt of the 2019 Automobile Assessment Guide table used by the Auditor's Office, for Mercedes, indicating that a 2014 S Class four door sedan with rear wheel drive ("RWD") has an assessment of **3090**.   Dividing by .06 gives a fair market value = **$51,500**, greatly in excess of the abated tax bill likely forced through by McCants.

27.     South Carolina law requires that personal motor vehicles be taxed based on fair market value. See S.C. Code Ann. § 12-37-2680.  South Carolina law provides motor vehicles are valued in accordance with nationally recognized publications of value, subject to limited statutory adjustments (such as high mileage), and are assessed at six percent (6%) of that value. The statutory scheme does not authorize arbitrary reductions below fair market value.  Rather, the fair market value, reflected by recognized valuation guides and market transactions such as the actual purchase price, forms the basis for assessment. By directing that McCants' Mercedes be entered at an artificially reduced assessment) despite its substantially higher recent purchase price and/or fair market value, McCants caused the vehicle to be taxed at less than its legally required fair market value. McCants was cheating the system, and forcing subordinates to assist her illicit acts.

28.     McCants must have gotten cold feet thereafter, because later tax bills for the Mercedes are significantly higher, likely as a result of McCants using a more realistic assessment value for the car.

29.    In 2018 McCants forced office staff to perform the exact same type of abatement for a member of McCants' family, reducing the relative's tax bill by hundreds of dollars.

30.    McCants sometimes interlineated her desired result on the assessment/bill itself.  Usually the (legal) assessment value would be crossed out, with McCants penciling in a new (illegal) lower value and lower tax amount that Supervisor McCants expected Plaintiff (or other staff) to input into the system. Plaintiff was extremely concerned and upset by such pressure.

31.    On the other hand (unless it was an election year), McCants' policy was that taxpayers not in the favored group of friends and relatives did not get favorable treatment. To the contrary, McCants frequently made sure they didn't even get what the law required. McCants forced employees like Plaintiff to ignore law as to other taxpayers (not in the preferred group) to deprive such taxpayers certain benefits to which they were entitled, such as, for example, on high mileage cars, cars which had been off the tax rolls, and boats. McCants routinely overrode statutory valuation rules for favored individuals while refusing lawful reductions for others, instructing staff to ignore mandated adjustments and substitute arbitrary figures, telling staff things like "*I don't want to go that low.*" McCants forced employees like Plaintiff to ignore clear mandates of South Carolina law.

32.    The unlawful pressure placed on Plaintiff contributed directly to both stress-related and other medical conditions that required FMLA leave and ADA disability accommodation.  Plaintiff's enormous concern and extreme discomfort in such situations, caught between Supervisor on the one hand and the law of South Carolina on the other hand, led to substantial health effects. Plaintiff discussed McCants' actions with fellow

employees, but did not report this conduct up the chain of command or to outside authorities.

*Supervisor McCants' Sloppy, Disorganized Office Policies*

33.     McCants was a disorganized Supervisor.  For example, she did not regularly review the performance of office employees like Plaintiff. Upon information and belief, Plaintiff had several reviews, but none since approximately 2013.

34.     McCants was also sloppy and inconsistent as to paperwork regarding employee hours and absences.  Initially Supervisor McCants required employees to submit timesheets every pay period describing time worked, personal days off, sick days, and vacation days.  All these timesheets should have been loaded in employees' personnel files, but that was not consistently done, and/or Defendant has refused to provide Plaintiff with the same.  For at least the last ten years, Supervisor McCants' office policy was only to submit "leave sheets" if an employee was sick or going to take personal or vacation time. Leave sheets and time sheets were to be signed by employee.  This policy was unevenly enforced based on whether or not an employee was part of the favored group.

35.     McCants did not require employees to clock in or clock out and did not maintain contemporaneous time records reflecting actual daily attendance. Consequently, Defendant cannot produce objective documentation establishing Plaintiff's alleged "*frequent absences.*" Having failed to implement basic timekeeping procedures, Defendant relies on vague, unsupported and conclusory characterizations of attendance, which is consistent with its post-hoc, pretextual justification for Plaintiff's termination.  Comparator evidence supports Plaintiff's contention.

36.     Defendant did not contemporaneously document attendance concerns or maintain uniform timekeeping records. Instead, any alleged attendance "issues" surfaced only after Plaintiff exercised her federal statutory rights and returned to work. The absence of objective time records, coupled with the belated characterization of Plaintiff's attendance as problematic, supports a reasonable inference that Defendant's proffered explanation was formulated after the fact to justify an adverse employment action.

37.     Supervisor McCants did not enforce such limited "papering" requirements as existed on all employees equally, but rather selectively, arbitrarily and capriciously. Favored employees did not have to paper their leave requests to the same extent as Plaintiff.

38.     Plaintiff has requested her personnel file on multiple occasions, but did not receive all of the leave sheets, doctor's notes, and timesheets that she submitted, upon information and belief, either because they were not maintained by HR, McCants did not submit them to HR, and/or Defendant simply refuses to produce the same.  Plaintiff also requested all records of the dispute at issue, but has been rebuffed. Defendant thereby interfered with Plaintiff's proper exercise of her federal rights, including as to 29 C.F.R. § 825.500.

*Office Policies Regarding Leave & Plaintiff's Leave History*

39.     Plaintiff accrued, was entitled to and regularly took vacation leave, personal leave, and sick leave per Sumter County policies, as did all other employees in the office.

40.     The office policy for the last ten years of Plaintiff's employment was that if an employee was going to take time off, whether vacation or personal time, she would have to tell McCants personally, get approval, and then write it on the office calendar, a hardcopy calendar posted in the office itself.

41.     Plaintiff almost always gave supervisor McCants at least two week's notice if Plaintiff were going to take vacation or personal days, frequently much more.  For example, Plaintiff always scheduled a week or so off for her birthday -- months in advance. Occasionally, when matters came up that needed Plaintiff to be absent, she gave less than two week's notice in emergent circumstances.

42.     Leave was to be posted on the calendar, and submitted on a signed leave sheet, which should have (but apparently did not) make it into the Plaintiff's employment file.  For scheduled surgeries and things of that nature, Plaintiff typically scheduled the same at least a month or two in advance.

43.     Plaintiff is married, and she and her husband have a child, so sometimes Plaintiff had to take sick leave or personal days to care for her husband and child.

44.     In 2022, plaintiff took FMLA leave for major surgery when she had a hysterectomy. She also took FMLA leave in 2008, when her child was born.

45.     As for sick days, which obviously could not be scheduled in advance, office policy was to provide Supervisor McCants with a medical note, signed by a doctor, for absences greater than three days. Plaintiff complied with this policy, although Plaintiff always got a medical note for *any* sick leave.  However, not all of the doctors' notes submitted by Plaintiff have been produced upon request following her request for her file.

46.     Plaintiff was qualified for and capable of performing the essential functions of her position.

*The FMLA Medical Leave & ADA Disability in Question*

47.     Prior to September 10, 2024, Plaintiff experienced medical issues that qualified as a serious health condition under the FMLA and as a disability under the ADA, and/or caused Defendant to regard Plaintiff as having such a disability.

48.     In April 2024 Customer X (identity to be revealed confidentially) came into the office with a renewal tax bill from November 2022 on a car which had been off the tax rolls with the tags turned into DMV, but needed a current paid tax receipt to re-register. He was initially assisted by Natalie, a new employee. Natalie [incorrectly, but as directed by Supervisor Odell Thompson] produced for him a tax bill from November 2022 through November 2023, and also produced a tax bill from November 2023 to November 2024. Customer X paid both tax bills, then went to the DMV office. The DMV office sent him back to the Auditor's Office saying "*we need a current tax bill.*"

49.     Plaintiff refunded the erroneously issued full-year tax bill for November 2023 through November 2024 and, consistent with South Carolina's motor vehicle property tax proration framework, issued a prorated tax bill from November 2023 through April 2024 (the date the vehicle was returned to taxable status), followed by a new current registration-year bill from April 2024 through April 2025. South Carolina law ties motor vehicle property taxes to the registration year and requires proration when a vehicle is removed from or returned to the tax rolls. Plaintiff's handling of the matter was consistent with DMV requirements and established county tax procedures.[1]

---

[1] South Carolina motor vehicle property taxes are assessed and collected in connection with the vehicle's registration year and are required to be paid before the Department of Motor Vehicles may issue or renew registration. See S.C. Code Ann. §§ 12-37-2610 (assessment of motor vehicles), 56-3-210 (requiring proof of paid property tax prior to registration), and 12-37-2620 (providing for proration and adjustment of property taxes upon changes in registration status). Under this statutory framework, counties routinely prorate motor vehicle taxes when a vehicle is removed from or returned to the tax rolls, and DMV requires a current, properly calculated tax receipt before issuing registration.

50.     The customer then paid both properly issued, correct bills and went back to DMV, who accepted the receipts.  Another supervisor, O'Dell Thompson, then told Plaintiff that Plaintiff handled the situation incorrectly, and reported the matter to McCants. McCants in a staff meeting told all employees (all of whom knew McCants was referring to Plaintiff): "*I hear we have been giving money away*."  Plaintiff showed Odell and McCants the law, but McCants and Thompson continued to openly deride Plaintiff's actions and embarrass her.  McCants ultimately told Plaintiff words to the effect of "*we're going to do it my way.*"  "McCants' way" leads to higher tax revenues from taxpayers and was not in compliance with South Carolina law.

51.     Shortly thereafter, the exact situation occurred with a different customer, Customer Y (identity to be disclosed confidentially), who happened to be a friend or neighbor of McCants, McCants ordered office staff to give the same refund that Plaintiff had given Customer X, and for which both McCants and Odell had excoriated Plaintiff.

52.     During the week ending Friday, September 6, 2024, Supervisor McCants was putting a lot of pressure on Plaintiff, on a tax roll issue similar to that described in the preceding several paragraphs for another customer.  Plaintiff was discussing the issue of the overcharging of customers on tax bills of this sort with her colleagues.   The issue had attracted notice in the Treasurer's office, who was sending taxpayers whose cars had not been on the tax rolls back to the Auditor's Office.

53.     At some point prior to September 6, 2024 County Treasurer Carolina Richardson called supervisor McCants about the issue.  Supervisor McCants was unhappy that employees from the Auditor's Office (who were following state law) we're giving refunds to these taxpayers.

54.    On Friday, September 6, 2024, after supervisor O'Dell Thompson overheard the discussion referenced in par. 56, there was an argument about the issue. Plaintiff reiterated her position was supported by state law, and even showed Supervisor Thompson relevant law. Thompson responded with words to the effect of "*Kim you are so sassy and you always got something to say, but that's the way we're going to do it.*" Plaintiff responded: "*but we are cheating the customers*." Thompson responded: "*say what you want to say but McCants has spoken.*"

55.    Plaintiff was intensely concerned about the repercussions of being forced to create illegal legal tax documents, not following the law, favoritism in the office for preferred people, coupled with failure to give taxpayers not in the favored group less than what the law provided.  In particular, Plaintiff was very concerned as to whether she might face criminal prosecution.

56.    As a result of the illicit and unlawful pressure described above, Plaintiff experienced mental anxiety, stress, and depression, and physically began experiencing high blood pressure, numbness on her left side, migraine headaches and heart palpitations, all of which caused her to believe she was going to have a stroke.

57.    Plaintiff had a history of heart issues and palpitations.  Plaintiff had appointments with her cardiologist on August 12, 2024 and August 15, 2024, just prior to being put on medical leave. **Exhibit G p. 3-4**.

58.    These conditions (and others) substantiate both the need for FMLA medical leave, and constitute a disability under the ADA.  Employer also perceived Plaintiff as having a disability.

59.     On September 6, 2024, Plaintiff left the office and went straight to her doctor's office.  Her regular doctor, Dr. Nutter, was not there, but she saw PA Nettles in the office.  Plaintiff returned that Monday, September 9, 2024, and saw Dr. Nutter, who ordered an MRI, and also ordered psychological counseling for Plaintiff (which continues to this day).  Notably, Dr. Nutter ordered FMLA leave for Plaintiff.  Initially, Dr. Nutter ordered 21 day leave. See medical note attached at **Exhibit G, p. 2**.

60.     As Plaintiff was leaving her doctor's office on Monday, September 9, 2024, she called Keysa Rogers in Sumter County Human Resources, and told her about the situation, told her that Plaintiff would be going out on FMLA leave, and said that the doctor's office would be sending the requisite paperwork.  Ms. Rogers said words to Plaintiff to the effect of "*I will take care of everything*."

61.     Plaintiff asked Rogers if Plaintiff needed to call Supervisor McCants, to which Rogers responded: "*yes you can*." Plaintiff called Supervisor McCants and told her "*the doctor has put me out on FMLA leave*."  Supervisor McCants responded: "*is there anything I need to know?*"  Plaintiff responded: "*no ma'am--HR has everything*."

62.     On September 13, 2024, Rogers signed the initial disability claim form attached as **Exhibit H, p. 5**, indicating "first date of disability" as "09/09/2024."

63.     The corresponding initial disability claim form (Physician) signed by Dr. Nutter on September 20, 2024 is attached as **Exhibit H, p. 6**, and states "symptoms first occurred on: 9/6/24" – and that Plaintiff initially consulted with Patrick Nettles, PA. This form also states next appointment date is "10/9/24" and "date of expected release" as "10/10/24".  Defendant knew at least as early as the date of this document, September 20, 2024, that Plaintiff would not be back to work before "10/10/24."

64. These serious medical conditions were not foreseeable, and substantiate both the FMLA leave in question and also "disability" under the ADA.

65. On September 10, 2024, Dr. Nutter's office also completed the Certification of Health Care Provider for Employee's Serious Health Condition under the Family and Medical Leave Act attached as **Exhibit I**, and upon information and belief forwarded that document to Sumter County HR.

66. Defendant's initial approval of Plaintiff's FMLA medical leave is attached as **Exhibit H, p. 12-13.** It states:

> we have reviewed information related to your need for leave under the FMLA along with any supporting documentation provided and decided that your FMLA leave request is . . . Approved. All leave taken for this reason will be designated as FMLA leave.

Notably, the second page of this document (**Exhibit H, p. 13**) states:

> **Return-to-work requirements**. To be restored to work after taking FMLA leave, you ([x]will be/□ will not be) required to provide a certification from your health care provider (fitness-for-duty certification) that you are able to resume work. This request for a fitness for-duty certification is only with regard to the particular serious health condition that caused your need for FMLA leave. If such certification is not timely received, your return to work may be delayed until the certification is provided.

67. Following Dr. Nutter's September 9, 2024 order, Plaintiff went out on FMLA leave beginning September 9, 2024. As disclosed at **Exhibit H, p. 6,** Plaintiff had a behavioral health appointment on September 18, 2024 (handwritten note: "*BH seen 9/18/24*") as well as a follow-up behavioral health appointment on Monday, September 30, 2024, and a follow up appointment at Dr. Nutter's office on Tuesday, October 1, 2024. **Exhibit G, p. 1.**

68. These appointments resulted in Dr. Nutter ordering additional leave. See **Exhibit J**, note from Dr. Nutter. Specifically, Dr. Nutter ordered Plaintiff off until October

16, 2024, followed by half time from October 16 through October 31, 2024, with full time commencing November 1, 2024. See attached **Exhibit H**, containing email dated October 2, 2024 from Linda Sue Stengel to Supervisor McCants, confirming revision in medical leave dates (**Exhibit H, p. 1).**

69.     The revised Initial Disability Claim Form – Physician's Statement is attached as **Exhibit H, p. 7**. It was signed by Dr. Nutter and dated October 2, 2024. It states that Plaintiff shall be "*out of work through 10/15/24 then return at half days through 11/1/2024.*" It lists Plaintiff's next appointment as 11/1/24 and that Plaintiff continues under the care of behavioral health.

70.     On October 2, HR Rogers confirmed Defendant's approval of the extended FMLA leave by signing a Continuing Disability Claim Form – Employer's Statement -- confirming first date of disability as "9/09/24" and "expected return to work date: 10/16/2024." **Exhibit H, p. 15.**

71.     HR Stengel sent a follow up email on October 15, 2024 to Supervisor McCants confirming that Plaintiff remained out on medical leave. That email is attached as **Exhibit H, p. 8-11.** It states that Plaintiff:

> is scheduled to return to work, half days (intermittent) from 10/16/24–11/1/2024. During this period, she should work from 8:30 AM – 12:30 PM. On Monday, 11/4/2024, she is authorized to return to work with no restrictions.

72.     Plaintiff went back to work half time on October 16, 2024 (20 hours per week) and resumed full time on November 1, 2024.

73.     The necessity of Plaintiff's medical leave was not foreseeable. Plaintiff notified Defendant as soon as practicable under the circumstances. Defendant Employer

received the medical certifications and did not dispute eligibility. Defendant appeared, at least initially, to accept the medical leave request.

74.     Plaintiff's request for medical leave in September – October 2024 constituted not only a request for leave under the FMLA, but also a request for a reasonable accommodation under the ADA. A finite period of medical leave to address a serious health condition is a recognized reasonable accommodation under the ADA. By requesting and taking medically supported leave, Plaintiff placed Defendant on notice of her need for accommodation due to disability.  Defendant had actual knowledge of Plaintiff's disabling medical conditions through medical certifications, doctor's note(s), and direct communications with Human Resources and Supervisor McCants. Plaintiff's treating physician ordered leave, MRI testing, cardiology appointments, and ongoing counseling, all of which were communicated to Defendant.

75.     Plaintiff returned to work on October 16, 2024, following the conclusion of her approved (full time) FMLA leave. She worked part time, approximately 20 hours per week for two weeks, until November 1, 2024, at which time she resumed her normal full-time work schedule.

*Plaintiff's Return to Work; Supervisor McCants' Interference,*
*Retaliation & History of Punitive Actions Demonstrate Violations of Federal*
*Statutes and Establish Motive and Pretext*

76.     Upon Plaintiff's return, Supervisor McCants appeared angry and hostile, and assigned Plaintiff to job duties and responsibilities that were different and not equivalent to her previous position, while at the same time "piling on" her workload and giving her work that could have and would have normally been done by others. See, e.g. **Exhibit B, p. 1**.  For example, prior to going on FMLA leave, Plaintiff was the principal

person responsible for the important job of preparing First Time Issue of Newly Purchased Vehicle Reports ("FTI Reports"). Upon her return, Supervisor McCants took this important responsibility away from Plaintiff, and required her to train a fellow employee in how to complete the form, penalizing Plaintiff for taking FMLA leave.

77. By such action, Supervisor McCants actively dissuaded and discouraged Plaintiff from taking FMLA leave in the future, directly interfering with the legal and justified exercise of Plaintiff's federal rights.

78. Supervisor McCants has a history of penalizing employees, including Plaintiff, for taking leave. For example, in 2019 Plaintiff was out sick for several days. Prior to that time Plaintiff had shared an office with Odell Thompson, the second in command of the office. However, upon Plaintiff's return to work, McCants immediately moved Plaintiff out of the office she had shared with Thompson, moved a white employee into Plaintiff's desk, and forced Plaintiff to sit out on the front desk.

79. Similarly, on June 30, 2022, Plaintiff's daughter Kinsley got strep throat. Plaintiff took Kinsley to the doctor, as set out in **Exhibit K p. 2**, and stayed home with her sick daughter on Friday, July 1. McCants retaliated against Plaintiff by forcing her to use vacation time, instead of sick time, for the missed day July 1, 2022. **Exhibit K, p. 1.**

80. True to form, upon Plaintiff's return from medical leave on October 16, 2024, McCants took Plaintiff's normal desk away, forcing Plaintiff to sit at a lower desk in the corner.

81. Plaintiff has a documented history of scoliosis and spinal impairment, which substantially limits major life activities including sitting, standing, and working for extended periods without proper ergonomic support. Upon her return from medical leave,

Defendant forced Plaintiff to sit at a lower workstation that aggravated her spinal condition. Plaintiff complained about the seating arrangement, and the pain she was in, including to McCants, thereby requesting reasonable accommodation in the form of an appropriate workstation. Plaintiff contacted HR Rogers regarding the same, who arranged for a McLeod Hospital Specialist to come review the work station. Plaintiff asked Rogers to confirm with Supervisor McCants that McCants was agreeable with the same, and Rogers responded in the affirmative. Nevertheless, when the McLeod Hospital Specialist came into the office to review Plaintiff's work station, McCants was visibly angry, and fired Plaintiff two days later.

82.     In addition to work station accommodations, Plaintiff had also requested resumption of her prior duties, including FTI Reports. Defendant refused and/or failed to meaningfully address or accommodate these requests.

83.     On December 12, 2024, approximately 6 weeks after her return to full time work, Defendant terminated Plaintiff's employment.

84.     On the day of her termination, December 12, 2024, after 10:45 break Supervisor McCants came to her door and said "step into my office." Supervisor McCants then told Plaintiff:

> *"you made us work really hard while you were out, and you put a hardship on the office . . . "*

Plaintiff responded:

> *"it was nothing intentional -- I was on FMLA."*

Supervisor McCants responded:

> *"your desk is being assessed. I know you are sick, you're not well, so take a walk with me upstairs [to HR]."*

The two then went upstairs to HR, and ultimately Defendant terminated Plaintiff that day, not even allowing Plaintiff to return to her desk to gather her personal effects.

85.     Supervisor McCants actively discouraged Plaintiff from taking FMLA/ADA leave in the future by such statements, directly interfering with the legal and justified exercise of Plaintiff's federal rights. Plaintiff is currently and actively seeking employment in Sumter (and other counties) and has been rejected from numerous positions for which she is qualified. Defendant unlawfully discouraged Plaintiff and other employees from exercising FMLA [and ADA] rights in violation of federal statutes and regulations, including without limitation 29 C.F.R. § 825.220(b).

86.     Defendant also regarded Plaintiff as disabled within the meaning of the ADA. Supervisor McCants stated to Plaintiff: "*I know you are sick, you're not well*," immediately prior to her termination. Defendant treated Plaintiff as medically impaired and unable to reliably perform her job and used her medical condition as a basis for adverse employment action.  That action flies in the face of the mandatory "interactive process."

87.     Supervisor McCants illegally used FMLA-protected absences as points against Plaintiff in Defendant's attendance policy, leading to discipline or termination.

88.     Defendant stated that the reason for Plaintiff's termination was:

"*frequent absences are unmanageable*."

**Exhibit A**.

89.     Defendant's stated reason directly referenced and illegally relied upon Plaintiff's protected FMLA leave and disability-related absences protected by the ADA.

90.     At no time prior to her medical leave had Plaintiff been informed that her attendance was "unmanageable" or that her job was in jeopardy due to absences.

91.     Upon Plaintiff's return to work on October 16, 2024, from then until she was fired on December 12, 2024, because of McCants's angry and hostile demeanor, Plaintiff was very circumspect about any absence from the office.  She only recalls being absent once, for a cardiologist appointment on November 19, 2024.  **Exhibit D** reflects that 1.5 hours of sick time was used on that date.  There is also an entry of 1.5 hours of paid vacation time used on December 4, 2024.  **Exhibit L.**   Plaintiff does not recall using any vacation time that day.  Plaintiff was paid by direct deposit, and did not always download or print her pay stubs, so she was not always immediately aware of entries such as found in **Exhibit D** and **Exhibit L.**

92.     Defendant failed to engage in any good-faith interactive process to reasonably accommodate Plaintiff's medical condition and disability.

93.     Once Plaintiff notified Defendant of her disabling medical conditions and requested medical leave and workplace adjustments, Defendant had an affirmative obligation under the ADA to engage in a timely, good-faith interactive process to identify reasonable accommodations, particularly upon her return, and to not retaliate against Plaintiff.

94.     Rather than engage in dialogue, explore options, or restore Plaintiff to her prior workstation and duties, as required by the ADA, Defendant unilaterally altered Plaintiff's responsibilities, placed her in a workstation that aggravated her spinal condition, and shortly thereafter terminated her employment. Defendant never met with Plaintiff to discuss accommodations, never proposed alternatives, and never attempted to determine whether reasonable adjustments would allow Plaintiff to continue performing the essential functions of her position. The failure to engage in the interactive process constitutes an

independent violation of the ADA where, as here, it resulted in the denial of reasonable accommodation.

95.    Defendant's actions were willful, reckless, and in callous disregard of Plaintiff's federally protected rights.

96.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered lost wages, lost benefits, loss of future pension rights, emotional distress, humiliation, and other damages.

97.    Plaintiff was forced to liquidate her retirement at a substantial financial loss in order to meet basic living expenses following her termination.

98.    Defendant's stated reason for termination in **Exhibit A** is unlawful and pretextual on its face. Defendant's illegal termination of Plaintiff was motivated by Plaintiff's attempt to vindicate her federal statutory rights under FMLA and ADA.  Her termination was also motivated by her disability and/or perceived disability, and her engagement in protected activity.

99.    Upon information and belief, comparator employees within the Sumter County Auditor's Office took medical leave and/or sought accommodations for medical conditions and were permitted to return to work without termination or discipline. These employees were supervised by McCants and were not discharged for "*frequent absences*" or otherwise penalized upon returning from protected leave. The more favorable treatment afforded to these employees undermines Defendant's asserted, pretextual justification for Plaintiff's termination, and supports a reasonable inference that Plaintiff's discharge was in retaliation for exercising federal rights.   Defendant selectively, arbitrarily, and

capriciously enforced attendance standards against Plaintiff after she took protected leave, in violation of federal law.

100.    As a result of Defendants' unlawful conduct, Plaintiff suffered substantial economic and non-economic damages, including the loss of her employment just **_22 months_** shy of pension eligibility with immediate retirement rights, forcing her to prematurely liquidate her pension/retirement at significant financial loss in order to survive.

101.    Plaintiff was forced to liquidate her South Carolina Retirement System benefits in the gross amount of **_$71,860.71_**. By doing so, she did not merely lose a modest multiplier increase—she forfeited all accumulated service credit, forfeited eligibility for a defined-benefit pension, forfeited a guaranteed lifetime monthly annuity, and forfeited the statutory cost-of-living adjustment protections that attach to SCRS retirement benefits. Had she been permitted to complete her final twenty-two months of service, Plaintiff would have been entitled to a lifetime annuity of approximately $1,474 per month, totaling more than **_$530,000_** over a conservative 30-year retirement period. Instead, Defendant's actions converted decades of earned public retirement security into a finite lump-sum distribution incapable of replicating the guaranteed lifetime income she had earned over twenty-six years of service.  The economic harm inflicted upon Plaintiff is not temporary—it is permanent, actuarial, and will compound over the remainder of her life.

102.    Plaintiff has actively been seeking work, including other positions with Sumter County, without success.  Upon information and belief she has been illegally "blackballed" by Defendant, in violation of the FMLA and ADA, as a warning to her and other employees to deter them from exercising federal rights.

## COUNT I – FMLA (Interference)

103.    Plaintiff incorporates all paragraphs outside of this Count I as if fully set forth herein.

104.    Plaintiff was an eligible employee under the FMLA.

105.    Defendant was a covered employer under the FMLA with sufficient number of employees.

106.    Plaintiff sought to exercise her rights under the FMLA by taking protected medical leave.

107.    Plaintiff was entitled to medical leave, an FMLA benefit.

108.    Defendants stripped Plaintiff's FMLA leave of its statutory protection, treated it as unauthorized leave subject to termination, then punished Plaintiff for taking such leave. Sumter County interfered with Plaintiff's FMLA rights by treating her FMLA-protected leave as a negative factor in an attendance-based termination decision.

109.    Defendants also interfered with the exercise of Plaintiff's FMLA rights by failing to restore her to equivalent position, with same job duties, responsibilities, perquisites, benefits and seating arrangements she held before FMLA leave.  For example, Defendant forced Plaintiff to train a temporary employee (who left the office in the short term anyway) to do the FTI reports McCants knew full well Plaintiff knew how to do, as a penalty, and "piled on" the work of others to Plaintiff. Defendant intended to dissuade Plaintiff and others from exercising federal rights. Defendants' actions exacerbated Plaintiff's disability.

110.    Defendants also violated federal regulations implementing FMLA designed to provide employees access to documents in their file, thereby interfering with the proper

and legitimate exercise of Plaintiff's federal rights, including without limitation as to Defendant 29 C.F.R. § 825.500.

111.    Defendants actions are a clear and obvious breach of the FMLA, including without limitation freedom from penalty.  Defendants' actions violate *inter alia* 29 U.S.C. § 2615(a)(1), and 29 C.F.R. § 825.220(c).

112.    Defendants' actions substantially harmed Plaintiff, who was only 22 months away from being able to retire with full retirement and pension benefits.  Instead, Plaintiff had no choice but to liquidate her pension/retirement at a substantial loss for living expenses.

113.    The termination occurred under circumstances that raise a reasonable inference of unlawful action prohibited by FMLA. Plaintiff's request for medically necessary leave and workplace adjustments constituted protected activity under the FMLA. Defendant's removal of duties, arbitrarily piling onto Plaintiff the work of others, failure to provide ergonomic accommodation, and termination shortly after Plaintiff's return from leave demonstrate unlawful interference prohibited by FMLA.

114.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the FMLA, warranting liquidated damages.

115.    Defendant's actions directly caused Plaintiff substantial damages and loss of past and future income, and the full value of her pension, as well as emotional suffering, mental anguish, and loss of enjoyment of life.

## COUNT II – FMLA (Retaliation)

116.    Plaintiff incorporates all paragraphs outside of this Count II as if fully set forth herein.

117.    Plaintiff was an eligible employee under the FMLA.

118.    Defendant was a covered employer under the FMLA with sufficient number of employees.

119.    Plaintiff sought to exercise her rights under the FMLA by taking protected medical leave.  By seeking FMLA leave, by taking it, and by attempting to return to her position, Plaintiff engaged in activity protected by federal statutes, including FMLA.

120.    Plaintiff was entitled to medical leave, an FMLA benefit, as well as return to her employment position with the same perquisites, status, and duties.

121.    Defendant appeared, at least initially, to approve Plaintiff's FMLA leave request.

122.    However, upon return Defendant's true position became known, and Defendant retaliated against Plaintiff based on the exercise of federal rights.

123.    Defendant also denied Plaintiff the benefit of restoration to equivalent position, as well as the same job duties, responsibilities, perquisites, benefits and seating arrangements she held before FMLA leave, all in retaliation for exercising legitimate federal rights.  For example, Defendant removed the responsibility and duty from Plaintiff to do the FTI Reports, and forced Plaintiff to train a temporary employee to do them, as a penalty.  Defendant also "piled on" Plaintiff the work of others in retaliation.

124.    On December 12, 2024, five weeks after Plaintiff returned to work full time, Defendant terminated Plaintiff in clear and obvious retaliation for taking FMLA leave.

125.    There was a direct causal link and short temporal nexus between Plaintiff's exercise of her federal rights (including taking FMLA leave) and Defendant's termination of Plaintiff.

126.    Defendants actions are a clear and obvious breach of the FMLA, including without limitation freedom from penalty.  Defendants' actions directly violate *inter alia* 29 U.S.C. § 2615(a)(1), and 29 C.F.R. § 825.220(c).

127.    Defendant retaliated against Plaintiff who attempted to properly exercise her federal rights, thereby also violating federal regulations, including without limitation 29 C.F.R. § 825.500.

128.    Defendants' actions substantially harmed Plaintiff, who was only 22 months away from being able to retire with full retirement and pension benefits.  Instead, Plaintiff had no choice but to liquidate her pension/retirement at a substantial loss.

129.    The termination occurred under circumstances that raise a reasonable inference of unlawful action prohibited by FMLA.

130.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the FMLA, warranting liquidated damages. Defendant's justification for its actions is clearly and obviously pretextual, particularly given the history of Supervisor McCants' punitive actions.

131.    Defendant's actions directly caused Plaintiff substantial damages and loss of past and future income, the loss of the full value of her pension, as well as emotional suffering, mental anguish, and loss of enjoyment of life.

## COUNT III – DISABILITY DISCRIMINATION:

## FAILURE TO REASONABLY ACCOMMODATE

132.    Plaintiff incorporates all paragraphs outside of this Count III as if fully set forth herein.

133.    Plaintiff had a disability within the meaning of the ADA.

134.    Defendant had notice of Plaintiff's disability.

135.    Plaintiff requested reasonable accommodation in the form of medical leave and continuation of her prior job duties and appropriate workstation upon return. Defendant failed to engage in the interactive process required by the ADA and instead removed key job responsibilities, altered her workstation in a manner that exacerbated her spinal impairment, and ultimately terminated her employment.

136.    Plaintiff could and did perform the essential functions of her position, including with reasonable accommodation.

137.    Defendant failed to engage in the interactive process to assist Plaintiff in reasonably accommodating her disability, despite Plaintiff's requests.

138.    A finite period of medical leave is a recognized reasonable accommodation under the ADA. Defendant's termination of Plaintiff shortly after she utilized such leave constitutes a failure to accommodate and an unlawful denial of reasonable accommodation.

139.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages. Defendant's justification for its actions is clearly and obviously pretextual, particularly given the history of Supervisor McCants' punitive actions.

140.    Defendant's actions directly caused Plaintiff substantial damages and loss of past and future income, as well as emotional suffering, mental anguish, and loss of enjoyment of life.

## COUNT IV—DISABILITY DISCRIMINATION:

## WRONGFUL TERMINATION

### (ADA)

141.    Plaintiff incorporates all paragraphs outside of this Count IV as if fully set forth herein.

142.    Plaintiff was disabled, and Defendant knew she was disabled.

143.    Plaintiff's disability included stress-related cardiovascular symptoms, anxiety, depression, and spinal impairment, all of which substantially limited major life activities including working and concentrating. Defendant terminated Plaintiff because of these conditions and because of absences necessitated by them.

144.    Alternatively, Defendant regarded Plaintiff as having an impairment that substantially limited her ability to work and terminated her based on that perception.

145.    Plaintiff was terminated for taking leave necessitated by her disability.

146.    At time of discharge, Plaintiff was performing the job at a level that met Defendant's legitimate expectations.

147.    The discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination in violation of the ADA. Defendant's justification for its actions is clearly and obviously pretextual, particularly given the history of Supervisor McCants' punitive actions.

148.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages.

149.    Defendant's actions directly caused Plaintiff substantial damages and loss of past and future income, as well as emotional suffering, mental anguish, and loss of enjoyment of life

**COUNT V— DISABILITY DISCRIMINATION: RETALIATION**

*(ADA)*

150.    Plaintiff incorporates all paragraphs outside of this Count V as if fully set forth herein.

151.    Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation in the form of medical leave and appropriate workplace adjustments. Defendant's termination of Plaintiff shortly after such requests establishes a causal connection between protected activity and adverse action.

152.    Because of and very soon after engaging in this protected activity, Defendant discharged Plaintiff.

153.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages.

154.    Defendant discriminated against Plaintiff because of disability and perceived disability.

155.    At time of retaliation, Plaintiff was performing the job at a level that met Defendant's legitimate expectations.

156.    Retaliatory conduct occurred under circumstances that raise a reasonable inference of unlawful action by Defendant.

157.    Defendant's conduct was willful, malicious, and done with reckless disregard for Plaintiff's rights under the ADA, warranting punitive/exemplary damages.

Defendant's justification for its actions is clearly and obviously pretextual, particularly given the history of Supervisor McCants' punitive actions.

158.    Defendant's actions directly caused Plaintiff substantial damages and loss of past and future income, as well as emotional suffering, mental anguish, and loss of enjoyment of life.

**DAMAGES, PRAYER FOR RELIEF & REQUEST FOR TRIAL BY JURY**

WHEREFORE, as a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and continues to suffer substantial damages. Plaintiff respectfully prays for judgment against Defendant, and for legal, equitable, compensatory, special, consequential, and punitive damages, including reinstatement, injunctive relief to curb Defendant's discrimination, and including front pay and back pay and liquidated damages, tangible and intangible damages (such as emotional suffering, mental anguish, and loss of enjoyment of life), together with the costs of this action and attorneys' fees, as provided by federal law, prejudgment and post judgment interest, and for such other and further relief as this Court may deem just and proper.  Plaintiff requests that her claims be tried by a jury.

Respectfully submitted,

s/ Ben Le Clercq
Ben Le Clercq
(S.C. Bar #65754, U.S. District Court # 7453)
David D. Ashley
(S.C. Bar #76206, U.S. District Court #10220)
Le Clercq Law Firm
708 South Shelmore Blvd. #202
Mount Pleasant, SC 29464
Phone (843) 722-3523
Ben@LeClercqLaw.com
David@LeClercqLaw.com

**and**

<u>s/Robert M. Turkewitz</u>
Robert M. Turkewitz
Law Office of Robert M. Turkewitz, LLC
(S.C Bar #: 011589, U.S. District Court #: 4902)
St. Andrews Law Center
768 St. Andrews Blvd.
Charleston, SC. 29407
Office (843) 628-7868
Cell (843) 696-4549
Fax (843) 277-1438
Rob@rmtlegal.com
www.RMTLegal.com
***Attorneys for the Plaintiff***

February 25, 2026

VERIFICATION

I, Kimley Billie, pursuant to 28 U.S.C. Sec. 1746, do hereby verify and declare under penalty of perjury that the allegations set out in this complaint and true to the best of my knowledge, information and belief.

Date: 2-25-2026          Kimley Billie
                              Kimley Billie